## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NIK MORADI<br>2446 Massachusetts Ave.<br>Washington, D.C. 20008 | )<br>)<br>) |
|        Plaintiff, | )<br>)<br>) |
| and | )<br>) |
| DEBORAH MORADI<br>2446 Massachusetts Ave.<br>Washington, D.C. 20008 | )<br>)<br>) |
|        Plaintiff. | )<br>)<br>) |
|    vs. | )<br>) |
| THE GOVERNMENT OF THE<br>ISLAMIC REPUBLIC OF IRAN,<br>Its Ministries, Agencies, and<br>Instrumentalities<br>c/o Ministry of Foreign Affairs<br>Khomeni Avenue,<br>United Nations Street<br>Tehran, Iran | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| _____ | ) |

## COMPLAINT

Plaintiffs Nik Moradi ("Mr. Moradi") and Deborah Moradi ("Ms. Moradi"), complain of the actions of the Defendants, THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, its Ministries, Agencies, and Instrumentalities, and state in support thereof as follows:

### PARTIES

1.   Plaintiff Nik Moradi, is a United States citizen and a resident of the District of Columbia.  Nik Moradi was tortured and held in solitary confinement beginning on October 30, 2007 for a period of six and a half months by Defendants THE

GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, its Ministries, Agencies, and Instrumentalities (hereinafter collectively referred to as "Iran").

2.      Plaintiff Deborah Moradi, is a United States citizen and a resident of the District of Columbia. Ms. Moradi is the wife of Nik Moradi and was married to him throughout the period of his confinement and torture.

3.      Defendant, the government of the Islamic Republic of Iran, is a foreign sovereign designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) both at the time of the matters at issue in this Complaint at the time this Complaint was filed. Its activities as complained of herein were outside the scope of immunity provided by the Foreign Sovereign Immunities Act ("FSIA"), including 28 U.S.C. § 1605A.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330, 1331 and pursuant to the FSIA, 28 U.S.C. § 1605A.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4).

6.      Plaintiffs were domiciled in the State of Maryland at the time of Nik Moradi's confinement and torture, and the law of Maryland applies to the tort claims contained herein.

## STATEMENT OF FACTS

7.      Nik Moradi was born in Tehran, Iran on May 23, 1950.  Mr. Moradi immigrated to the United States when he was 14 years old and became a U.S. citizen in 1975.

8.      Deborah Moradi was born in Philadelphia, Pennsylvania on April 16, 1951.

9.      On or about October 30, 2007, Mr. Moradi travelled to Tehran, Iran to visit his

family. Following his arrival at the Merhabat Airport in Tehran, Mr. Moradi was

detained by officials of Defendant Iran inside the airport. Mr. Moradi was quickly

led out of the airport to an unmarked van with blacked out windows. He was

handcuffed, blindfolded, and transported to an Iranian prison.

10.     The prison Mr. Moradi was taken to was, upon information and belief, Jamshidieh

Prison in the northwest section of Tehran. Jamshidieh is a prison located on a base

operated by and for the military of Defendant Iran.

11.     When Nik Moradi arrived at the prison, he was taken to a barren room and forced

to strip. He was given a set of pajamas, plastic sandals, two blankets, a piece of

foam to use as a pillow, a plastic pitcher, two drinking cups and a bar of soap. Mr.

Moradi was blindfolded again and taken to a very tiny cell, which he describes as

an "oversized coffin."

12.     The cell in which the Islamic Republic of Iran held Mr. Moradi throughout his six

and a half months at Jamshidieh Prison was, in his estimation, approximately five

feet by eight feet in perimeter. Mr. Moradi was held in this cell, in solitary

confinement throughout his time in Jamshidieh Prison and was not allowed any

human interaction except for very limited communication with the guards and his

interactions with interrogators.  Mr. Moradi's interactions with his guards were

very restricted and did not include conversation.

13.     The cell in which Mr. Moradi was housed contained no light, no bathroom, and

no bed.  The walls and floor of his cell were made of concrete. Mr. Moradi had no

mattress, and had only the two blankets to cover himself and the floor on which

he slept.  The only light that entered Mr. Moradi's tiny cell came from a small opening in the door that let in light from the hallway, or through a mesh-like opening at the top of the cell.  A light outside Mr. Moradi's cell stayed on 24 hours a day, with a power source that Mr. Moradi could hear running constantly, and that he believed to be a diesel generator.

14.     The Iranian officials responsible for Mr. Moradi's confinement kept him on a near starvation diet.  Mr. Moradi was given a thin piece of bread and a tiny piece of feta cheese for breakfast; a bowl of rice with two pitted dates for lunch; and kidney beans with another thin piece of bread for dinner.

15.     During his confinement Mr. Moradi was not provided with any toilet or latrine facilities in his cell.  When Mr. Moradi needed to go to the bathroom, he had to hold up a card through the small slit in his door.  Mr. Moradi was not permitted to talk or otherwise call for the guards' attention when he needed to use the bathroom or at any other time.  When the guards arrived at his cell, Mr. Moradi was required to face away from the door.  A guard would enter the cell, blindfold Mr. Moradi and take him to the room that was used as a bathroom.  While in the bathroom, Mr. Moradi was watched at all times and given only a few minutes. Guards would abuse him if he took longer.  Requests to use the bathroom more than once per day were met with physical and verbal abuse.

16.     While held in Jamshidieh Prison, Mr. Moradi was interrogated almost daily, and he was regularly drugged during these interrogation sessions.  Mr. Moradi was also beaten throughout his confinement.

17.    Mr. Moradi's interrogators frequently, and in graphic detail, threatened to kill Mr. Moradi. They threatened to hang and disembowel him, and showed him graphic images of another prisoner whom the Iranians had hung from a frame and used a meat cleaver to slice open, exposing his bowels. The man appeared as though he was still alive, but obviously suffering and in extreme pain. The guards described how they could do this to Mr. Moradi and then left him alone with the images.

18.    The Islamic Republic of Iran used extreme solitary confinement, physical abuse, threats against Mr. Moradi's life, and drugs in order to solicit a false confession from Mr. Moradi in which he stated that he was a spy. This occurred after the Iranian officials eventually broke Mr. Moradi and he agreed to "confess." The interrogators instructed Mr. Moradi to state in his confession that he was working as a spy for the FBI, CIA, KGB, Mossad, and other intelligence agencies. To the best of Mr. Moradi's knowledge the KGB no longer exists; nonetheless, he was forced to confess, under torture, that he was working for that organization. The Islamic Republic of Iran released Mr. Moradi after he submitted his false confession, six and a half months after Mr. Moradi first began his captivity in solitary confinement.

19.    Throughout his time in the prison, Mr. Moradi was never permitted to contact his wife. During the first three months of Mr. Moradi's confinement, Iran never confirmed to the U.S. Department of State or Mrs. Moradi that it was holding Mr. Moradi.

20.    Mr. Moradi's confinement caused him severe and extreme psychological distress both during his imprisonment and after his release. Mr. Moradi's confinement

and torture also caused severe depression and led to numerous suicide attempts when Mr. Moradi could no longer tolerate the extreme and unending isolation and torture.

21.     As a result of his confinement and torture, Mr. Moradi was deprived of the love, support and comfort of his wife, Ms. Moradi, throughout the period of his detention in prison in Iran, and through the months that followed during which he was not permitted to leave Iran.

22.     As a result of Mr. Moradi's confinement and torture, Ms. Moradi was deprived of the love, support and comfort of her husband throughout the period of his detention in prison in Iran and through the months that followed during which Mr. Moradi was not permitted to leave Iran.

23.     Nik Moradi's confinement interrupted the intimate relations between he and Ms. Moradi.  Further, the treatment to which Mr. Moradi was subject while confined by Defendants has continued to affect the intimate relations between Nik and Deborah Moradi.  Both Mr. Moradi and Ms. Moradi have been harmed thereby.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE: 28 U.S.C. § 1605A)

24.     Paragraphs 1 through __ above are incorporated as if set forth herein.

25.     Plaintiff Nik Moradi was a citizen of the United States when arrested and held unlawfully by Iran. While being held in solitary confinement, Mr. Moradi was physically and psychologically tortured as described herein.

26.     Antiterrorism provisions codified at 28 U.S.C. § 1605A(a) establish a federal right of action against Defendants for committing acts of torture.

27. Section 1605A provides four elements for a claim under the provision against a foreign state, all of which are met here:

    (a)    that defendant be designated as a state sponsor of terrorism;

    (b)    that claimant be a national of the United States;

    (c)    that the foreign country must be given reasonable opportunity to arbitrate the claim if the conduct took place on foreign soil; and

    (d)    That the act alleged be caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act…"

28. Iran was designated a state sponsor of terrorism by the Secretary of State on January 19, 1984. *See* 49 Fed. Reg. 2836 (Jan. 23, 1984).

29. Both Mr. Moradi and Ms. Moradi were citizens of the United States at the time of his imprisonment and torture. Mrs. Moradi was born in the United States. Mr. Moradi became a citizen of the United States in 1975.

30. The definition of "torture" under the FSIA, derived from § 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), codified at 28 U.S.C. § 1350 (note), defines torture to include:

> Any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

31. Defendants and their agents intentionally subjected Nik Moradi, while he was in their custody and physical control, to more than six and a half months of severe

pain and suffering, including solitary confinement, physical and mental abuse, and threats against his life, all with the intent to obtain a false confession and coerce his cooperation. Defendants' conduct was torture as defined under the FSIA.

32.   A foreign state is held vicariously liable for the acts of its officials, employees, or agents. 28 U.S.C. § 1605A(c)(4).

33.   Mr. Moradi continues to suffer severe physical and psychological harm to this day as a result of his torture by the Defendants and their agents.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION - ASSAULT AND BATTERY)

34.   Paragraphs 1 through __ above are incorporated as if set forth herein.

35.   Defendants committed or are responsible for numerous acts of assault and battery upon Mr. Moradi during his confinement and torture.

36.   Under the FSIA, a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

37.   Defendants are stripped of their immunity under the FSIA because of their acts of torture, and are therefore liable for torts in the same manner and to the same extent as a private individual.

38.   Defendants applied force to the person of Mr. Moradi and took actions reasonably tending to create the apprehension in Mr. Moradi that they were about to apply such force to him. Defendants also intended harmful or offensive contact with Mr. Moradi without his consent. Defendants' conduct included intentionally and

repeatedly threatening Mr. Moradi's life, threatening bodily injury, and physically attacking  Mr. Moradi.

## COUNT III

## (§ 1605A(c) CAUSE OF ACTION - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

39.     Paragraphs 1 through __ above are incorporated as if set forth herein.

40.     Defendants' use of extreme solitary confinement, threats and physical abuse, and restrictions of Mr. Moradi's contact with his wife and other relatives, was intentional and reckless, extreme and outrageous and caused Mr. Moradi severe emotional distress.

41.     Defendants' treatment of Mr. Moradi violated acceptable norms of treatment under both U.S. and international law, and was also for that reason extreme and outrageous.

42.     Defendants' actions left Mr. Moradi severely emotionally and psychologically damaged.  Mr. Moradi continues to suffer from nightmares about his captivity and torture, has difficulty sleeping, and suffers physiological difficulties from this trauma.

## COUNT IV

## (§ 1605A(c) CAUSE OF ACTION - FALSE IMPRISONMENT)

43.     Paragraphs 1 through __ above are incorporated as if set forth herein.

44.     Mr. Moradi was deprived of liberty without cause and without legal justification. Defendants also held Mr. Moradi despite knowledge that they had no basis to do so.

(§ 1605A(c) CAUSE OF ACTION - LOSS OF CONSORTIUM)

## COUNT V

### (§ 1605A(c) CAUSE OF ACTION - LOSS OF CONSORTIUM)

45.     Paragraphs 1 through __ above are incorporated as if set forth herein.

46.     At the time of Nik Moradi's detention and torture, he was married to Deborah Moradi and they continue to be married.

47.     Defendants' torture of, and tortious conduct with respect to, Nik Moradi deprived both him and Deborah Moradi of the loss of society, affection, solace, assistance and conjugal fellowship.  This loss has continued after his release given the continuing psychological trauma that has prevented Nik and Deborah Moradi from resuming conjugal relations.

### PRAYER FOR RELIEF

48.     As a result of the personal injuries they have suffered due to acts of torture, Plaintiffs are entitled to economic damages, solatium, and pain and suffering, all of which are recoverable under the FSIA. 28 U.S.C. § 1605A.

49.     In addition to all appropriate compensatory damages, Plaintiffs are entitled to punitive damages because Defendants' acts were intentional, malicious, and performed deliberately to injure, damage and harm Plaintiffs.

50.    Plaintiffs further seek costs, attorney's fees, and such other relief as may be just

and proper.

Dated: April 30, 2013                              Respectfully submitted,

Carol Elder Bruce (D.C. Bar #202200)
Amy J. Eldridge (D.C. Bar # 1000291)
K&L Gates LLP
1601 K Street
Washington, D.C. 20006
Tel:     (202) 778-9000
Fax:     (202) 778-9100