## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
                                            )
**NIK MORADI, et al.,**                     )
                                            )
    **Plaintiffs,**               )
                                            )
        **v.**                    )     **Civil Action No. 13-0599 (ESH)**
                                            )
**ISLAMIC REPUBLIC OF IRAN,**               )
                                            )
    **Defendant.**                )
_____ )

## <u>MEMORANDUM OPINION</u>

Nik Moradi ("Nik") and his wife, Deborah Moradi ("Deborah"), bring this action against the Islamic Republic of Iran ("Iran") under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking money damages for injuries they suffered as a result of alleged acts of torture committed against Nik during his almost six-month detention in an Iranian prison. Iran failed to respond to the complaint, and plaintiffs have now moved for a default judgment. (Mot. for Default Judgment, Sept. 23, 2014 [ECF No. 18].) In order to obtain a default judgment under the FSIA, plaintiffs must establish their claim or right to relief by evidence that is satisfactory to the Court. *See* 28 U.S.C. § 1608(e). As explained herein, plaintiffs have met this standard. Accordingly, the Court will grant the motion for default judgment.

### FINDINGS OF FACT

The evidence in the record before the Court establishes the following facts.

### I.    BACKGROUND

Nik Moradi was born in Iran in 1950. (Decl. of Nik Moradi ¶ 1 ("N. Moradi Decl.").) At the age of 14 or 15, after his father had died, he came to the United States, joining an older

brother and sister.  (*Id*. ¶ 4.)  Nik became a United States citizen in 1975, and he has maintained

dual citizenship ever since.  (*Id*. ¶ 9.)  He never finished college, but he became a successful

businessman, owning and operating several clothing stores.  (*Id*. ¶ 6.)  In 1983, his mother

moved to the United States.  (*Id*. ¶ 1.)  In 1985, he married Deborah.  (*Id*. ¶ 8.)  For over 20

years, from 1985 until 2007, Nik and Deborah enjoyed a "happy life," with frequent social

engagements.  (*Id*. ¶ 8.)  During those years, Nik traveled to Iran from time to time to visit family

who remained there, in particular a sister and her two children.  (*Id*. ¶ 9.)

**A.      Nik Moradi's Detention by the Islamic Republic of Iran (October 2007-April 2008)**

The events directly relevant to the pending action began on October 31, 2007, when Nik

arrived at the International Airport in Teheran for what he thought would be a four-day visit.  (*Id*.

¶¶ 10, 12.)    When Nik arrived he was met by Iranian authorities who told him there was a

"problem" and that he would be their "guest for the night."  (*Id*. ¶ 12.)  He was then handcuffed,

blindfolded and driven from the airport to an unknown location where he was told to undress and

put on a pair of pajamas and plastic sandals.  (*Id*. ¶¶ 13, 15.)  A piece of masking tape with

numbers on it was stuck to his chest.  (*Id*.)  His clothes were put in a garment bag, and the bag

was hung from a pipe where other garment bags were also hanging.  (*Id*.)  The man who took

Nik's clothes described himself as a "mortician" – a person who "is brought people who are dead

so that he can wash them and put the[m] in the ground."  (*Id*.)  After the mortician gave Nik a

few supplies ("two blankets, a pillow-sized piece of foam, a plastic pitcher, two plastic cups and

a bar of soap") (*id*. ¶16), he was again blindfolded and taken to a cell.  (*Id*.)  When Nik saw the

size of the cell – no more than five feet by eight feet – he "panicked and started to yell" (*id*. ¶

17); he also tried to stop the door from being shut by putting his head next to the door and told

them he "was dying and couldn't breathe." (*Id*.)  At that point, he was injected with something and thrown into the cell. (*Id*.)

Nik was kept in solitary confinement in this cell for the next 5 1/2 months, except when he was taken out for interrogations. (*Id*.)  The cell was concrete with no light other than what could be glimpsed in the hallway through the small opening with iron bars at the top of the door. (*Id*. ¶ 16.)  There was no bed or other furniture or toilet. (*Id*. ¶ 26.)  He was not allowed to make noise or to speak to the guards, and he had no contact with any other human beings, except his interrogators. (*Id*. ¶ 27.)  Whenever he was taken out of the cell, he was blindfolded. (*Id*.)  If he needed to use a bathroom, he showed the guard a card with a picture on it. (*Id*.)  He was punished if he asked to go to the bathroom more than once a day. (*Id*. ¶ 29.)  He was given very little food to eat and was "constantly starving." (*Id*. ¶ 28.)  He was also given "truth pills" every day. (*Id*. ¶ 31.)

In addition to being kept in solitary confinement under these harsh conditions, Nik was repeatedly subjected to lengthy interrogations, during which he was accused of working with foreign agencies against Iran and of being a spy. (*Id*. ¶¶ 20, 25, 37.)  During these interrogations, he was both verbally threatened and mentally and physically abused. (*Id*. ¶¶ 21, 35, 41, 42.)  He was repeatedly told that he would be hanged. (*Id*. ¶¶ 21, 30, 31, 32.)  On more than one occasion, his left hand was cuffed to a railing on the wall or a bar while he was on the floor, forcing him to contort his body into an extremely painful position. (*Id*. ¶ 35.)  He would be left alone in that position for extended periods of time. (*Id*. 35.)  For a long time, Nik responded truthfully that he was not working for anyone or against the Islamic Republic of Iran. (*Id*. ¶ 39.)  Over time the interrogations became more brutal. (*Id*. ¶ 41.)  Nik was subjected to lengthy beatings while being interrogated and would often pass out; on one occasion a hole was burned

into his thigh.  (*Id*. ¶¶ 41, 42.)  On another occasion, he was shown a picture of another prisoner who had been tied with rope to a frame, hanging upside down, and had a cut from his crotch through his intestines, which were hanging out of his body.  (*Id*. ¶ 43.)  Standing next to this prisoner was a man in a black executioner's mask, holding a meat cleaver.  (*Id*.)  After showing Nik the picture, the interrogators tied him to a similar frame and threatened him with similar treatment if he did not confess to spying against Iran.  (*Id*. ¶¶ 44, 45.)  On yet another occasion, guards urinated on Nik's head while he was lying on the ground blindfolded and with his hands and feet bound.  (*Id*. ¶ 46.)  Nik was also sexually assaulted while blindfolded.  (*Id*.)  He also often had seizures, which he had never had before.  (*Id*. ¶ 49.)

There came a point when Nik thought that he could bear no more and that he wanted to die.  (*Id*. ¶¶ 47, 48.)  He made several unsuccessful attempts to kill himself or to goad his interrogators into beating him severely enough to kill him.  (*Id*. ¶ 47.)  Finally, after having a dream about his mother that made him worry that something had happened to her, Nik broke down and told his interrogators that he would tell them whatever they wanted as long as he could call his mother.  (*Id*. ¶ 52.)  The interrogators told him that they would find his mother, but that in the meantime he should start writing down answers to their questions, which they proceeded to dictate to him.  (*Id*. ¶ 53.)  As directed, Nik falsely confessed that he had worked with the FBI, the CIA, the KGB and other groups.  (*Id*.)  Nik's captors then tried to get him to implicate one of his friends, but Nik refused.  (*Id*. ¶¶ 55-57.)

Shortly after Nik's confession, he was taken before a judge for the first time.  (*Id*. ¶ 58.)  The judge ripped up Nik's confession, stating that he "knew" Nik was not a spy and that he would "issue a verdict" that Nik was not guilty and order him released.  (*Id*. ¶¶ 54, 58, 59.)

Nik's relatives in Iran put up the money for a $500,000 bond, and he was released on April 15, 2008.  (*Id.* ¶ 60.)

By the time of his release, Nik had lost 40 to 50 pounds. (Decl. of Deborah Moradi ¶ 15 ("D. Moradi Decl.").)  Due to passport issues, he was unable to leave Iran until November 2008.  (N. Moradi Decl. ¶ 61; D. Moradi Decl. ¶ 14.)  He initially flew to Dubai, where he was met by Deborah.  (N. Moradi Decl. ¶ 68; D. Moradi Decl. ¶ 14.)  By then he had regained some weight, but still weighed 20 pounds less than he had when he left the United States.  (D. Moradi ¶ 15.)  Only then did Deborah tell her husband that his mother had died while he was in prison.  (N. Moradi Decl. ¶ 68; D. Moradi Decl. ¶ 14.)

After Nik had left Iran, the Revolutionary Court decided to hold another hearing.  (N. Moradi Decl. ¶ 70.)  Nik did not return to Iran for the hearing, forfeiting the $500,000 bond.  (*Id.* ¶ 70.)  The Revolutionary Court found him guilty of spying and sentenced him in absentia to ten years in prison and 100 lashes.  (*Id.* ¶ 71.)

**B.     Injuries Suffered by Nik Moradi**

**1.     Physical and Psychological Injuries**

Nik suffered significant physical and psychological injuries while he was in prison.  In addition, his detention has caused long-term psychological injuries.[1]  When Nik first returned to the United States and for some time thereafter, he successfully suppressed his memory of many incidents; however, his memories eventually returned, causing him significant problems.  (N. Moradi Decl. ¶¶ 45, 46; D. Moradi Decl. ¶ 17.)  By all accounts, he is now a much different man

---

[1] Nik also suffers from severe bilateral macular degeneration and coronary artery stenosis.  (N. Moradi Decl. ¶¶ 78, 79.)  According to Nik, his primary physician believes his extended confinement in an unlit cell contributed to his eye problems and that his months without medication contributed to his arterial stenosis.   (N. Moradi Decl. ¶ 78, ¶ 79.)  However, Nik's hearsay statement of his doctor's opinion does not constitute competent evidence.

than he was before his detention.  He often cries and thrashes in his sleep, causing Deborah to

wake him to try and calm him down.  (N. Moradi Decl. ¶ 74; D. Moradi Decl. ¶¶ 17, 25.)  He and

Deborah both feel that he is not the person he used to be.  (N. Moradi Decl. ¶ 75; D. Moradi

Decl. ¶ 16 (after his return, "it soon became clear that he was not the same man he had been

before he was imprisoned").)  He has trouble thinking clearly.  (N. Moradi Decl. ¶ 75.)  He used

to have good relationships with many people; now, he cannot connect.  (N. Moradi Decl. ¶ 75; D.

Moradi Decl. ¶ 16 (describing Nik Moradi as "distant, fearful, and unable to connect with me or

others").)  He has no desire to go places or socialize with people.  (N. Moradi Decl. ¶ 75.)  He

usually feels depressed and lonely.  (*Id.* ¶ 75.)  He takes medication to help him sleep, but he is

never well-rested.  (*Id.*)  According to Nik, the only emotion he strongly feels now is anger at his

captors.  (*Id.* ¶ 76.)  He says that he "feel[s] as though my captors stole from me what it really is

to be human."  (*Id.*)

Nik has been diagnosed with post-traumatic stress disorder ("PTSD") and major

depressive disorder.  (Expert Report of Stuart Grassian, M.D., ¶ 11 ("Grassian Rep.")[2]; Expert

Report of Carol Santucci, LICSW, ¶¶ 5, 28, 29, 33 ("Santucci Rep.").[3])  PTSD is:

> the result of experiencing psychological trauma – an experience so horrifying, so
> frightening, that it overcomes the individual's capacity to cope, reducing him to
> absolute terror and horror.  It is characterized by intrusive images and thoughts of
> the traumatic event (awake, or asleep in the form of nightmares); acute
> physiologic reactions (heart pounding, sweating, dizziness, etc.) to stimuli

---

[2] Dr. Grassian is "a Board-certified psychiatrist, licensed to practice medicine in the
Commonwealth of Massachusetts" who has "been actively involved continuously since 1974 in
evaluating and treating patients for psychiatric disorders."  (Grassian Rep. ¶ 1.)  He was "a
member of the faculty at Harvard Medical School for more than twenty-five years."  (*Id.*)

[3] Ms. Santucci is "a licensed independent clinical social worker (LICSW)" who has been
practicing since 1996.  (Santucci Rep. ¶ 1.)  She has a Masters in Social Work from the Catholic
University of America and did a post-graduate fellowship in Advanced Psychotherapy at the
Yale University School of Medicine.  (*Id.*, Ex. A.)

reminiscent of the event; increased arousal (a constant state of vigilance, anxiety and tension, irritability, jumpiness), emotional numbing and depression (an inability to find pleasure or passion in anything), and avoidance of stimuli reminiscent of the event.  PTSD is characterized as well by feelings of shame and guilt, and not infrequently leaves the person immobilized with depression.

(Grassian Rep. ¶13.)  MDD "may be the result of a single terrifying event such as rape or surviving a fatal car accident, but the worst traumatic situations involve inescapable, repetitive trauma; the trauma of prolonged combat is an obvious example."  (Grassian Rep. ¶ 14.)  "MDD is characterized by somatic symptoms such as sleep or appetite disturbance, social withdrawal, impaired concentration, inability to find pleasure in usual activities, a loss of libido, feelings of hopelessness, worthlessness, and guilt."  (*Id*. ¶ 15.)   Nik has also been diagnosed with "Delirium: Solitary Confinement Syndrome."  (Grassian Rep. ¶ 11.)

In Dr. Grassian's opinion, Nik's disorders are the "direct result" of his treatment while detained and "[t]here is little hope for further improvement."  (Grassian Rep. ¶¶ 11, 65 ("These illnesses have persisted now for approximately six years without any significant improvement. . . . Studies have demonstrated that without significant amelioration of the symptoms of PTSD even after just six months, the prognosis for further improvement is very poor.").)  According to Dr. Grassian, Nik "remains deeply depressed, unable to find any pleasure in his life.  He feels shame that he has not wanted to have intimate relations with his wife in all the years since his release. He feels hopeless – like the world has closed in on him."  (Grassian Rep. ¶ 67.)  Dr. Grassian concludes that "[d]espite some efforts at receiving psychiatric and psychological help, there has been little change in Mr. Moradi's condition over the years since his release.  It unfortunately is not surprising that he has not, and likely cannot ever, heal from his wounds."  (Grassian Rep. ¶ 69; Santucci Rep. ¶ 33.)

7

### 2. Economic Injuries

During the time Nik was detained, "Deborah made the payments on the store, but it was not open for most of the time I was incarcerated and then unable to leave Iran." (N. Moradi Decl. ¶ 80.) Nik estimates that the store's closing during this period "caused [him] a loss in income of at least . . . $1,184,000, calculated based on sales over the previous years." (N. Moradi Decl. ¶ 80; D. Moradi Decl. ¶ 10.) Nik indicates that before his detention in Iran, he "did not plan to retire at particular age, and . . . [he] would have continued to own and operated the store for many more years. (*Id.* ¶ 80.)

### C. Injuries Suffered By Deborah Moradi

When Nik was first detained, Deborah had no idea what had happened to him. (D. Moradi Decl. ¶¶ 5, 9.) After a few days, she learned that he had been detained by the Iranian authorities, but for over a month after that she had no idea whether he was dead or alive. (*Id.* ¶ 8.) She eventually learned through the State Department, which made inquiries through the Swiss Embassy, that he was alive and that Iranian authorities might charge him with espionage (*id.*), but she had no contact with him while he was detained.

In addition to the anguish Deborah experienced during her husband's detention, Nik's detention has caused permanent damage to their relationship. (*Id.* ¶¶ 24-26 ("Nik's detention and the impact of that has affected every facet and level of our personal lives. We are no longer able to make each other happy and are becoming more estranged. With each passing week we withdraw from each other more and more.").) Since his return, Nik and Deborah have had no physical relationship, and she describes their marriage as "ruined." (*Id.* ¶¶ 21, 26 ("Since his return Nik has been so irritable, angry and depressed, we cannot have a normal relationship,

much less a happy one like we had before he was held in Iran."); *see also* N. Moradi Decl. ¶¶ 73, 76.)

### D.     Purpose of Detention

According to an expert report submitted by plaintiffs, the Iranian government detained

Nik, and has similarly detained other dual Iranian-American citizens,

> as part of a pattern and practice of behavior towards Iranian-American dual citizens, particularly active during the time period of the complaint, in which illegal actions were directed against such dual citizens for political purposes of the Iranian regime. These purposes included coercing political prisoners to make false confessions that they had taken actions against Iranian state on behalf of the American government.

(Expert Report of Mehdi Khalaji ¶ 34 ("Khalaji Rep.").[4])  In addition, in this expert's opinion,

Nik's detention was "undertaken at the direction, and with the active participation, of the Iranian

government."  (*Id.* ¶ 35.)

## II.   PROCEDURAL HISTORY

On April 30, 2013, Nik and Deborah Moradi timely filed[5] the pending action against the

Islamic Republic of Iran under 28 U.S.C. § 1605A , alleging that Nik's treatment during his 5½

month detention constituted torture that entitled them to compensatory and punitive  damages.

Plaintiffs successfully effectuated service on Iran via the procedure set forth in 28 U.S.C.

§ 1608(a)(4)—two copies of the summons, complaint and notice of the suit, along with

translations of each into Persian were provided to the Clerk of this Court on July 1, 2013, who

---

[4] Mehdi Khalaji is a Senior Fellow at the Washington Institute for Near East Policy.  (Khalaji Rep. ¶ 1 & Ex. A)  He has a Doctorate Degree in Shiite Exegesis and Theology from the University of Sorbonne in Paris, France and a Masters Degree in Western Philosophy from the University of Tarbiate Modarres in Qom, Iran.  (*Id.*)  He previously testified as an expert in *United States v. Lahiji*, 3:10-cr-00506 (D. Or. 2013).

[5] Section 1605A(c) of the FSIA provides that an injured party has ten years from the date the action accrued to initiate an action.  28 U.S.C. § 1605A(c).  As Nik was released from confinement on April 15, 2008, this action was filed within the ten-year statute of limitations.

then forwarded the documents to the Secretary of State (to the attention of the Director of Special

Consular Services).  (Affidavit of Service, Oct. 15, 2013 [ECF No. 9].)  The U.S. Department of

State confirmed that Iran was served with the documents and an offer of arbitration on July 31,

2013.  (*Id*.)  The Iranian Ministry of Foreign Affairs refused the documents that same day.  (*Id*.)

After defendant failed to respond to the complaint, the Clerk entered a default pursuant to

Federal Rule of Civil Procedure 55(a).  (Clerk's Entry of Default, Nov. 12, 2013 [ECF No. 13]).

Pursuant to Federal Rule of Civil Procedure 55(b), plaintiffs filed the pending motion for default

judgment.  (Mot. for Default Judgment [ECF No. 17] ("Mot.") & Memorandum in Support

Thereof [ECF No. 18], Sept. 23, 2014.)

## CONCLUSIONS OF LAW

### I.   LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT UNDER THE FSIA

Before this Court can enter a default judgment against Iran under the FSIA, plaintiffs are

required by to establish their claims "by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*see also Han Kim v. Democratic People's Republic of Korea*, No. 13-7147, 2014 WL 7269560,

at *2 (D.C. Cir. Dec. 23, 2014) ("when the defendant State fails to appear and the plaintiff seeks

a default judgment, the FSIA leaves it to the court to determine precisely how much and what

kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court'").

The Court "may not unquestioningly accept a complaint's unsupported allegations as true."

*Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012).  However, an

evidentiary hearing is not required; a "plaintiff may establish proof by affidavit."  *Id*.; *Weinstein*

*v. Islamic Republic of Iran,* 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

### II.   JURISDICTION UNDER THE FSIA

10

The first question that that must be answered in considering a motion for default judgment under the FSIA is whether the court has jurisdiction over plaintiffs' claims. The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in a United States court. *See* 28 U.S.C. § 1330; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Plaintiffs here assert jurisdiction under 28 U.S.C. § 1605A,[6] the "[t]errorism exception to the jurisdictional immunity of a foreign state." In relevant part, § 1605A provides that a foreign state

> shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency,

*Id*. § 1605A(a)(1). It further provides that a court "shall hear a claim under this section if–

> the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred . . . and . . . remains so designated when the claim is filed . . . . (ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred – (I) a national of the United States; . . . and (iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.

*Id*. § 1605A(a)(2)(A).

All of the conditions necessary to establish this Court's jurisdiction to hear plaintiffs' claims have been satisfied. First, starting with the requirements of § 1605A(a)(2)(A), plaintiffs

---

[6] The National Defense Authorization Act for Fiscal Year 2008, Pub.L. No. 110-181, § 1083 ("Defense Authorization Act") amended the FSIA by replacing 28 U.S.C.A. § 1605(a)(7) (the former state sponsored terrorism exception) with a new terrorism exception, codified at 28 U.S.C. § 1605A.

have established that (i) the Islamic Republic of Iran was designated a state sponsor of terrorism

in 2007-08 and remained so designated at the time this case was filed[7]; (ii) both Nik and Deborah

are United States citizens (*see* N. Moradi Decl. ¶ 9; D. Moradi Decl. ¶ 1), and thus United States

nationals as defined in § 1605A(h)(5)[8]; and (iii) an offer of arbitration was included with the

documents served on Iran on July 31, 2013.  *See Simpson v. Socialist People's Libyan Arab*

*Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) ("a reasonable opportunity to arbitrate" need not

precede the filing of the complaint).

Second, the requirements of § 1605A(a)(1) are met because plaintiffs are seeking money

damages for personal injuries caused by alleged acts of torture.  Under § 1605A, the term

"torture" is defined to "have the meaning given [it] in section 3 of the Torture Victim Protection

Act of 1991 (28 U.S.C. 1350 note)."  *Id.* § 1605A(h).  As defined therein:

> (1) the term "torture" means any act, directed against an individual in the
> offender's custody or physical control, by which severe pain or suffering (other
> than pain or suffering arising only from or inherent in, or incidental to, lawful
> sanctions), whether physical or mental, is intentionally inflicted on that individual
> for such purposes as obtaining from that individual or a third person information
> or a confession, punishing that individual for an act that individual or a third

---

[7] The term "state sponsor of terrorism" means a country the government of which the Secretary
of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979
(50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371),
section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a
government that has repeatedly provided support for acts of international terrorism.  28 U.S.C.A.
§ 1605A(h)(6).  The Islamic Republic of Iran has been designated a state sponsor of terrorism
since January 19, 1984.  *See* State Sponsors of Terrorism, U.S. Dept. of State,
http://www.state.gov/j/ct/list/c14151.htm (2014); *Goldberg–Botvin v. Islamic Republic of Iran*,
938 F. Supp. 2d 1, 5 (D.D.C. 2013); *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d
48, 64 (D.D.C. 2013).

[8] The term "national of the United States" has the meaning given that term in section 101(a)(22)
of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)), 28 U.S.C. § 1605A(h)(5), which
defines a "national of the United States" to mean "(A) a citizen of the United States, or (B) a
person who, though not a citizen of the United States, owes permanent allegiance to the United
States.  8 U.S.C. § 1101(a)(22).

person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), *codified at* 28 U.S.C. § 1350 (note).

In *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit gave extensive consideration to what conduct should be deemed to constitute torture under the FSIA.  294 F.3d 82, 92-93 (D.C. Cir. 2002).  It concluded that there were "two ambiguities lurking in the [TVPA's] definition" of torture: "The first concerns the meaning of 'severe':  how much actual pain or suffering must defendants inflict before their conduct rises to the level of torture?  The second involves the 'for such purposes' language: what must plaintiffs prove about the motivation for the alleged torture if they hope to deprive foreign states of their immunity?"  *Id*. at 92.  As to the severity requirement, the Court observed that it "is crucial to ensuring that the conduct proscribed by the Convention [Against Torture] and the TVPA is sufficiently extreme

and outrageous to warrant the universal condemnation that the term "torture" both connotes and

invokes." *Id*. Thus, it concluded that:

> [t]he critical issue is the degree of pain and suffering that the alleged torturer
> intended to, and actually did, inflict upon the victim. The more intense, lasting, or
> heinous the agony, the more likely it is to be torture. . . . This understanding thus
> makes clear that torture does not automatically result whenever individuals in
> official custody are subjected even to direct physical assault. Not *all* police
> brutality, not *every* instance of excessive force used against prisoners, is torture
> under the FSIA.

*Id*. at 93. Rather, the Court in *Price* agreed with the Senate that "torture is a label that is 'usually

reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic

beating, application of electric currents to sensitive parts of the body, and tying up or hanging in

positions that cause extreme pain.'" *Id*. at 92-93. As for the purpose requirement, the Court held

that "it is clear from the text of the TVPA that the list of purposes provided was not meant to be

exhaustive." *Id*. at 93. Rather, "this list was included in order to reinforce that torture requires

acts both intentional and malicious, and to illustrate the common motivations that cause

individuals to engage in torture." *Id*. Thus, the Court concluded that "whatever its specific goal,

torture can occur under the FSIA only when the production of pain is purposive, and not merely

haphazard." *Id*.; *see Han Kim v. Democratic People's Republic of Korea*, 2014 WL 7269560, at

*6 ("[S]uffering alone is insufficient to establish a claim under the FSIA's terrorism exception.

To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have

targeted the victim, for instance, to punish him for his religious or political beliefs.")

Applying its interpretation of the definition of torture to the complaint in *Price*, the Court

held that the allegations in the complaint were insufficient to allege torture because they

"offer[ed] no useful details about the nature of the kicking, clubbing, and beatings that plaintiffs

allegedly suffered," and, thus, there was "no way to determine . . . the severity of plaintiffs'

alleged beatings – including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out – in order to ensure that they satisfy the TVPA's rigorous definition of torture."  *Id*. at 94 ("In short, there is no way to discern whether plaintiffs' complaint merely alleges police brutality that falls short of torture."); *see also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d at 234 (holding that allegations that plaintiff was "interrogated and then held incommunicado," "threatened with death ... if [she] moved from the quarters [where she was] held," and "forcibly separated from her husband ... [and unable] to learn of his welfare or his whereabouts" "reflected a bent toward cruelty on the part of their perpetrators," but were "not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the Act").)

District courts in this jurisdiction applying the principles set forth in *Price* and *Simpson* have consistently concluded that victims treated similarly to Nik were victims of torture.  For example, in *Price*, after the case was remanded and the complaint amended, the District Court held that the amended complaint stated a claim for "mental torture" by alleging that the victims were "forced to watch on three separate occasions as fellow prisoners were beaten, one of whom was beaten to death," were "informed on each occasion that they would suffer the same fate if they refused to confess that they were guilty of espionage," and were "informed, during an interrogation at which cabinet-level Libyan officials were present, that they were being afforded one last chance to confess, or they would be beaten as they had seen their fellow prisoners be beaten."  *Price v. Socialist People's Libyan Arab Jamahiriya,* 274 F. Supp. 2d 20, 25 (D.D.C. 2003) (*Price II*), *aff'd*, 389 F.3d 192, 195-96 (D.C. Cir. 2004).  Similarly, in *Nikbin v. Islamic Republic of Iran*, the District Court concluded that "striking Nikbin repeatedly on the soles of his feet with an electrical cable, hanging Nikbin upside down from the ceiling during an

interrogation session, and assaulting Nikbin with a coke bottle prior to his departure from Iran," were "acts of torture" because they "were the very kinds of cruel and inhuman activities that concerned Congress when it passed the TVPA."  517 F. Supp. 2d 416, 425 (D.D.C. 2007); *see also Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (hostage taken by an Iranian-supported terrorist group experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Massie v. Government of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) (former members of a crew of a United States Naval vessel captured by the Government of the Democratic People's Republic of Korea (North Korea) in 1968 were victims of torture where they were "provided inadequate rations of food and forced to live in unsanitary conditions" and subjected to "individual threats of death, threats to kill others, [and] severe beatings" in order to coerce them into signing confessions); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 91, 97 (D.D.C. 2003) (victim was "tortured'" when his captors regularly beat him, threatened him with death, and confined him in "deplorable and inhumane conditions"); *Daliberti v. Republic of Iraq,* 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (victim who was held at gunpoint, threatened with physical injury if he did not confess to espionage, and incarcerated "in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities" experienced torture as defined by the FSIA); *Sutherland v. Islamic Republic of Iran,* 151 F. Supp. 2d 27, 45 (D.D.C. 2001) ("the deprivation of adequate food, light, toilet facilities, and medical care for over six years amounts to torture").

After considering the statutory definition of torture, the D.C. Circuit's precedential decisions in *Price* and *Simpson*, the instructive decisions of other district court judges, and the facts of this case as set forth above, the Court concludes that the physical and mental injuries

inflicted upon Nik by his interrogators constituted torture.[9]  His interrogators frequently subjected him to severe physical and mental pain, including threatening him with death and dismemberment, physically beating him, sexually assaulting him, and keeping him in excruciatingly painful positions for hours at a time during the interrogations.  His mistreatment clearly goes beyond a mere "instance of excessive force" against a prisoner; rather the infliction of pain was deliberate and malicious and for the purpose of eliciting a false confession.  Accordingly, the Court concludes that Nik was the victim of torture, and therefore, that it has jurisdiction over plaintiffs' claims against the Islamic Republic of Iran under § 1605A of the FSIA.

## III.    LIABILITY UNDER § 1605A

Section 1605A(c) creates a federal statutory cause of action for plaintiffs in an action brought under section 1605A.  It provides that a claimant or victim has a "private right of action" against "[a] foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i)" and that "the foreign state is liable for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages."  Section § 1605A(c) expressly incorporates the elements required to waive the foreign state's immunity and vest the court with subject matter jurisdiction – the acts set forth in subsection (a)(1) – as the basis for liability.  Accordingly, liability under § 1605A(c) will exist whenever the jurisdictional requirements of §1605A(a)(1) are met.  *See*

---

[9] Plaintiffs proffer two theories to support their claim that Nik was tortured: (1) he was tortured by the physical and psychological abuse he was subjected to by his interrogators while in prison; and (2) he was tortured by his extended solitary confinement.  Having concluded that Nik's treatment by his interrogators constituted torture, the Court need not decide whether his extended period of solitary confinement was sufficient to constitute torture.

*Kilburn*, 699 F. Supp. 2d at 155 ("Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action."); *see also Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 64–69 (D.D.C. 2008) (analyzing liability and jurisdiction together); *Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 72 (D.D.C. 2010) (same).

Accordingly, since the Court has determined that Iran, acting through its agents, tortured Nik within the meaning of § 1605A(a)(1), it follows that Iran is liable under § 1605A(c) for any personal injuries caused by that torture.

## IV.    DAMAGES UNDER § 1605A

As authorized by § 1605A(c), plaintiffs are seeking compensatory damages for pain and suffering, solatium, and economic damages, as well as punitive damages.  *See* 28 U.S.C. § 1605A(c).

### 1.    Compensatory Damages

To obtain compensatory damages in a FSIA case, a plaintiff "must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate."  *Reed*, 845 F. Supp. 2d at 213 (citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003)).

### a.    Pain and Suffering

Nik seeks $1.68 million in damages to compensate for his pain and suffering while he was detained and $13.4 million in damages to compensate for his pain and suffering since his release, including any future pain and suffering.

Plaintiffs have met their burden to prove that the pain and suffering Nik experienced during and since his detention was a reasonably certain consequence of defendant's acts.  The evidence establishes that Nik was tortured while he was detained with the desired and expected effect of causing him extreme physical and psychological pain.  The evidence further establishes that, as a result of defendant's torture, Nik now suffers from post-traumatic stress disorder and major depressive disorder, conditions from which he is unlikely to ever recover.  Thus, Nik is entitled to pain and suffering damages for the time he was detained and for the time since his release.  *See, e.g.*, *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005) (*Price III*) (awarding damages for pain and suffering during and after captivity because "[n]ot only do plaintiffs continue to suffer physical disabilities, such as tinnitus, but they have had continued difficulty in daily living, in social interactions, and in employment"); *Massie*, 592 F. Supp. 2d at 77 (awarding damages for during and after captivity because victims had "suffered physical and mental harm that ha[d] endured for the past 39 years and likely will continue to endure throughout the rest of their lives.")

Obviously, "[p]uting a number on these kinds of harms can be difficult."  *Price III*, 384 F. Supp. 2d at 134.  The primary consideration is to ensure that "individuals with similar injuries receive similar awards."  *See, e.g.*, *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012) (internal quotations omitted).  For the period of detention, plaintiffs seek damages of $1.68 million, a number that is based on a rate of $10,000/day for 168 days of detention.  Plaintiffs use the approach of $10,000/day because "[i]n many cases of prolonged and abusive captivity, plaintiffs are awarded approximately $10,000 per day for the pain and suffering they experienced while captive."  *Price III*, 384 F. Supp. 2d at 135 ($1.05 million for 105 days of captivity); *see also Massie*, 592 F. Supp. 2d at 77 (awarding $10,000 per day for 335 days of

19

imprisonment by government of North Korea); *Kilburn*, 699 F. Supp. 2d at 157 ($5.03 million

for 503 days as hostage); *Sutherland,* 151 F. Supp. 2d at 51 ($23.54 million for 2,354 days of

captivity); *Anderson v. Islamic Republic of Iran,* 90 F. Supp. 2d 107, 113 (D.D.C. 2000) ($24.54

million for 2,454 days of captivity).   As Nik's treatment while detained was comparable to the

treatment of these other detained victims, the Court finds $10,000/day or $1.68 million to be a

reasonable estimate of pain and suffering damages for Nik's period of confinement.

        For the post-detention period, plaintiffs seek damages of $13.4 million, the amount of

post-release pain and suffering damages awarded to each victim in *Massie*, a FSIA case that is

similar to the present case in that the victims there were also held and tortured by a foreign

government (North Korea).   However, there are also critical differences between the victims in

*Massie* and Nik, including that the victims in *Massie* were held for a much longer period of time

(335 days) than Nik (168 days) and that by the time the victims in *Massie* were able to file suit

and obtain a judgment, 39 years had passed since their release, as compared to the 7 years that

have elapsed since Nik's release.   In addition, the victims in *Massie* were younger at the time of

their release than Nik was, exposing them to many more years of post-release suffering.   Indeed,

although not expressly stated, it is apparent that the Court's post-captivity pain and suffering

award in *Massie* was exactly four times the award for pain and suffering during captivity.   Using

that multiplier would result in an award of $6.72 million in the present case.   The Court will not

use the amount of post-release damages awarded in *Massie* to determine damages in this case.

This conclusion is bolstered by the fact that in other cases with post-release pain and suffering

damages awards, courts have awarded $7 million to victims with longer periods of post-release

suffering and more severe injuries than Nik.   *See, e.g*., *Price III*, 384 F. Supp. 2d at 136

(awarding $7 million for post-captivity pain and suffering to a 57-year old victim who had

suffered for the past 25 years and would likely suffer for the rest of his life); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 220 (D.D.C. 2003) (awarding $7 million for post-captivity pain and suffering), *vacated on other grounds*, 370 F.3d 41 (D.C. Cir. 2004).  Considering these cases and the specific facts of this case, the Court concludes that $5 million is the appropriate amount of damages for Nik's post-release pain and suffering.

Accordingly, the Court will award Nik a total of $6.168 million in pain and suffering damages.

### b.    Economic Damages

Nik seeks economic damages in the amount of $2.784 million to compensate for lost earnings, during his detention, since his release and in the future.  (*See* Mem. at 29 ("From the first day of his detention in 2007 to the present, Mr. Moradi's business has suffered.  It suffered first from his imprisonment and since his release because of his reduced and increasing inability to work given his physical and psychological condition that resulted from his detention in Iran."); *id*. (Nik "had planned to work for at least five more years, but because of his condition will soon have to permanently close his store.").  According to the motion for default judgment, Nik is entitled to $1.184 million in damages for past lost earning and $1.6 million for future lost earnings.  (*Id*.)

As a general rule, lost earnings – past and future – are compensable economic damages. *See* Restatement (Second) of Torts § 906.  In addition, the Court does not doubt that defendant's acts caused Nik a loss of earnings, past and future.  *Id*. ("Loss in earning capacity may result from an imprisonment or from a harm to the body, as when there is a physical impairment, from harm to the mind, as when the injured person suffers a nervous shock . . . .").  But to obtain an award of damages, plaintiffs must "prove the amount of damages by a reasonable estimate."

21

*Reed*, 845 F. Supp. 2d at 213; *see Kilburn*, 699 F. Supp. 2d at 156 (declining to award economic

damages where "plaintiffs presented no evidence to support an economic damages award").

Here, Nik's declaration is the only evidence supporting his claim for lost earnings, and it

is insufficient to support any award of economic damages.[10]  As previously noted, all that Nik's

declaration says about a specific monetary loss is that because the store was often closed during

the time he was in Iran, he suffered "a loss in income of at least . . . $1,184,000, calculated based

on sales over the previous years."  But the declaration does not say what those sales figures are,

over how many years, or how sales figures have been used to calculate lost income.  As far as the

record before the Court shows, there is no evidentiary support for Nik's estimate of his lost

income.  Nor does the declaration say anything specific about when Nik plans to retire, how

much earlier it would be than planned, and or what amount of lost earnings an early retirement

would cause.  Unlike damages for pain and suffering, lost earnings are not hard to quantify, and

the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent

evidence.  *See, e.g*., *Reed*, 845 F. Supp. 2d at 214 ("The report of a forensic economist may

provide a reasonable basis for determining the amount of economic damages in an FSIA case.");

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (awarding damages

based on a forensic economic expert's report).[11]  Accordingly, the Court declines to award any

economic damages.

---

[10] Statements that appear in plaintiffs' memorandum in support of the motion for default
judgment are not evidence.

[11] The Court need not decide whether an expert is necessary to prevail on a claim for economic
damages under § 1605A because what has been provided here is clearly not sufficient.

c.      **Solatium Damages**

Deborah seeks solatium damages in the amount of $4 million.  "Solatium claims under the FSIA are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of Iran*, No. 12-cv-0042, 2014 WL 5141429, at *2 (D.D.C. Oct. 14, 2014).  "They are intended to compensate persons for 'mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort.'"  *Id*. (quoting *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal citation and quotation marks omitted)).  "Such claims are also available to compensate along similar lines those related to persons merely injured, rather than killed, in a terrorist attack."  *Id.*

Although "[c]ourts may presume that spouses and those in direct lineal relationships with victims of terrorism suffer compensable mental anguish," *see id.* (citing *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 30 (D.D.C.1998)), the record here establishes that Nik's detention and torture caused Deborah significant "mental anguish" (*see Deborah Moradi* Decl. ¶¶ 5-9, 20), and that due to the nature of Nik's injuries, her emotional distress is ongoing.  (*Id*. ¶¶ 16-18, 21, 24, 26 ("Nik's detention and the impact of that has affected every facet and level of our personal lives.  We are no longer able to make each other happy and are becoming more estranged.   With each passing week we withdraw from each other more and more.").)  The Court is also satisfied that Deborah's emotional distress "was reasonably certain to occur" as a result of Nik's detention and torture.  *See Reed*, 845 F. Supp. 2d at 213 (finding damage to son during his formative years from father's detention and torture reasonably certain to occur).  The remaining issue is how to quantify the damages due to Deborah.

Solatium damages, like damages for pain and suffering, are by their very nature unquantifiable.  Deborah bases her request for $4 million in solatium damages on the so-called "*Heiser*" framework.  *See Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006).[12]  The *Heiser* framework is a "standardized approach for evaluating solatium claims" which has been repeatedly used by courts in this jurisdiction to determine damage awards in FSIA terrorism cases.  *See, e.g.*, *Spencer*, 2014 WL 5141429, at *3; *Owens v. Republic of Sudan*, No. 01-cv-2244, 2014 WL 5395774, at *5 (D.D.C. Oct. 24, 2014).  Under this approach, "spouses of deceased victims receive $8 million, parents of deceased victims receive $5 million, and siblings of deceased victims receive $2.5 million."  *Owens*, 2014 WL 5395774 (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)).  "[W]here the victim does not die, but instead only suffers injury, the solatium awards are halved: Spouses receive $4 million, parents receive $2.5 million, and siblings receive $1.25 million." *Id*. Although the *Heiser* framework was developed in the context of large-scale terrorist attacks, courts have also applied the framework in cases of hostage-taking or torture.  *See, e.g*., *Reed*, 845 F. Supp. 2d at 213-14 (awarding $2.5 million to son of deceased victim who was held hostage for 3.65 years); *see also Kilburn*, 699 F. Supp. 2d at 158 (using *Heiser* framework but increasing award from $2.5 million to $5 million due to extremely close relationship between deceased victim and his brother and other unique circumstances).  Indeed, the individual injuries suffered by a close family member are not likely to be diminished simply because their loved one is the

---

[12] In *Heiser*, family members and estates of 17 United States servicemen killed in a bomb attack in Saudi Arabia brought actions against Islamic Republic of Iran, Iranian Ministry of Information and Security (MOIS), and Iranian Islamic Revolutionary Guard Corp (IRGC*).  Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

only one injured or one of a few rather than one of many.  Accordingly, the Court will use the *Heiser* framework here and award Deborah $4 million in solatium damages.

### 2.   Punitive Damages

Plaintiffs seek $300 million in punitive damages.  Punitive damages "serve to punish and deter the actions for which they are awarded."  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-56 (D.D.C. 2012).  Courts calculate the proper amount of punitive damages by considering "four factors: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Id*. at 56 (internal quotations omitted).  Although the Court believes that the "societal interests in punishment and deterrence warrant imposition of punitive sanctions" in this case, *Onsongo v. Republic of Sudan*, No. 08-cv-1380, 2014 WL 3702875, at *6 (D.D.C. July 25, 2014), it does not accept plaintiffs' proposed amount.

Plaintiffs base their request for a $300 million punitive damages award on the fact that in another case against the Islamic Republic of Iran, the Court awarded punitive damages in that amount.  *See Sutherland*, 151 F. Supp. 2d at 53.  In *Sutherland*, though, the victim was taken hostage by a terrorist group supported by Iran's Ministry of Information and Security, and the Court awarded the plaintiff $300 million in punitive damages because it was three times the amount of annual funding provided by Iran to the Ministry of Information and Security.  *Id*. Here, the detention and torture was carried out directly by Iranian authorities, so the Court does not agree that the punitive damages award should be based upon Iran's funding of its Ministry of Information and Security.  Instead, following the approach of other courts in cases where the expenditure-times-multiplier method has been rejected, the Court will award punitive damages in an amount equal to the total compensatory damages awarded.  *See, e.g*., *Onsongo*, 2014 WL

3702875, at *6; *Opati v. Republic of Sudan*, No. 12-1224, 2014 WL 3687125, at *8-9 (D.D.C. July 25, 2014).  As set forth above, the total compensatory damages award in this case is $10.168 million, the sum of $6.168 million for pain and suffering plus $4.0 million in solatium damages. Accordingly, the Court will award punitive damages in the amount of $10.168 million.

## CONCLUSION

For the reasons stated above, the Court will grant plaintiffs' motion for default judgment and enter judgment for plaintiffs in the amounts specified above.  A separate Default Judgment accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 5, 2015